IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROBERT F.,[1]<br><br>           Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>           Defendant. | Case No. 3:20-CV-296-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## BACKGROUND

Plaintiff filed applications for DIB and Supplemental Security Income (SSI) on January 3, 2017, alleging a disability onset date of February 17, 2015. Defendant denied his application initially on April 24, 2017, and again upon reconsideration on July 31, 2017. Plaintiff requested a hearing by an Administrative Law Judge (ALJ) shortly thereafter, and a hearing was held on November 5, 2018. On February 14, 2019, the ALJ issued a decision unfavorable to Plaintiff. Plaintiff then filed a request for review of the hearing decision with Defendant's Appeal Council. The ALJ's decision became final

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

when the Appeals Council denied review on February 12, 2020. This appeal followed. It is undisputed that Plaintiff exhausted his administrative remedies.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

1. The ALJ impermissibly interpreted the results of an MRI.
2. The ALJ failed to properly evaluate Step 2 of the sequential evaluation.

## LEGAL STANDARD

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows

an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### DECISION OF THE ALJ

The ALJ followed the five step sequential evaluation process outlined above. She first determined that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2020. She next found that Plaintiff had not worked at the level

of substantial gainful activity[2] since the alleged onset date, February 17, 2015. He was 31 years old on that date.

The ALJ found that Plaintiff has the following severe impairments: obesity, diabetes mellitus with peripheral neuropathy, and degenerative disc disease of the lumbar spine. She further found, however, that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in the Code. She found that Plaintiff "has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except that he should never climb ladders, ropes, or scaffolds and should only occasionally climb ramps and stairs." (Tr. at 16). She further found that Plaintiff:

> is occasionally able to balance, stoop, kneel, crouch, and crawl. He should have no more than occasional exposure to vibration, pulmonary irritants (such as dust, fumes, odors, gases, and poor ventilation) and hazards (such as unprotected heights). The claimant requires the use of an assistive device, but he is able to lift/carry up to exertional limits with his other upper extremity.

*Id.*

Ultimately, she found that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms he reports, but that his statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 17).

---

[2] "Substantial gainful activity" is defined as "work activity that involves doing significant physical or mental activity for pay or profit." 20 C.F.R. 404.1572 and 416.972.

The ALJ found that Plaintiff is unable to perform any past relevant work. Based on the testimony of a vocational expert, the ALJ found that Plaintiff was not disabled because he was able to do other jobs (sedentary work) that exist in significant numbers in the national economy, such as hand packer, production worker, and inspector tester sorter. (Tr. at 23).

## EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record, including Plaintiff's extensive medical records, is directed to the points raised by Plaintiff.

### I.    Evidentiary Hearing

Plaintiff was represented by counsel at the evidentiary hearing held on November 5, 2018. He testified that he worked full time as a home maker for health care from 2000 to 2003 and again from 2007 to 2015. His responsibilities included assisting clients with physical transfers and picking up medication. He quit that job because he was injured in February 2015 (and filed a workers' compensation claim regarding the incident). Specifically, he testified that he tore his meniscus and another tendon and his knee "popped" out of place. (Tr. at 44). He testified that he underwent surgery in 2015 but the knee "kept locking" so he underwent another surgery in 2016. (Tr. at 45). Nonetheless, he testified that the knee is "still not right." (Tr. at 45). In fact, he testified that both of his knees are bad, and he cannot walk or stand in any one place at one time." (Tr. at 46).

Plaintiff reported being 5'9" inches tall and weighing around 420 pounds. (Tr. at 47). He told the ALJ that his low back "has been killing" him—that it burns and feels like

he can't bend over, and "there's a sharp shooting pain if I turn my neck wrong." (Tr. at 49). He also testified that he was having breathing issues, needing a rescue inhaler once or twice a day. (Tr. at 53). He also admitted to smoking about a pack of cigarettes a day. (Tr. 53-54). He claimed to have nerve damage in his right arm (caused by an accident in 2004), as well as hip and right knee pain. (Tr. at 54-55). He explained that he relies on a cane, which was prescribed by a healthcare provider, to move around. (Tr. at 55-56). According to Plaintiff, he had used crutches for about two years before he started using the cane. (Tr. at 60).

Plaintiff told the ALJ that his wife does all the household chores, and he relies on her to bathe him and put on his socks. (Tr. at 57). He also testified that he does not drive a car and had not for some time because it's easier for him to get in and out of the passenger side of the car, with his left knee problems and the steering wheel hitting his belly. (Tr. at 59).

Plaintiff has an eighth grade education and no GED, but he can read. (Tr. at 62). At the time of the hearing, he rated his knee pain (without pain medication) to be a 7 or 8 on a scale of 1 to 10 when sitting, but a 10 when he was walking into the hearing. (Tr. at 63-64).

Dr. Darrell W. Taylor, a vocational expert, testified that Plaintiff's physical limitations and need for an assistive device would limit him to sedentary work. (Tr. at 68). But Dr. Taylor testified that there are approximately 22,000 sedentary, unskilled hand packer positions nationally; 25,000 sedentary, unskilled production worker positions nationally, and approximately 12,000 unskilled, sedentary inspector, tester, sorter

positions nationally. (Tr. at 69).

**Relevant Medical Records**

Following his knee injury on February 17, 2015, Plaintiff sought treatment from Dr. James Sola at Illinois SW Orthopedics. (Tr. at 366). At his first visit on March 5, 2015, Dr. Sola noted degenerative changes in his left knee, which may have been recently aggravated and reduced range of motion. *Id.* Dr. Sola ordered an MRI to be conducted that day and recommended anti-inflammatory medication and therapy. *Id.*

The MRI taken on March 5 showed the medial meniscus, anterior and posterior cruciate ligaments, and medial collateral ligamentous complex were intact but the lateral meniscus and joint space was "not well appreciated." (Tr. at 368). The examination of the area of concern in the lateral knee was limited because of "extensive metallic artifact overlying the lateral knee from known shotgun pellet." (*Id.*) Other impressions included "small joint effusion," "lateral subluxation of patella with shallow trochlear groove," and "mild to moderate osteoarthritic changes in the patellofemoral and visualized medical compartment." (*Id.*).

Plaintiff next saw Dr. Sola on March 16, 2015. (Tr. at 369). At that time, Plaintiff still lacked 7-10 degrees of extension in the left knee. (*Id.*) Dr. Sola suspected a possible lateral meniscus tear, and noted that the MRI was not valuable to diagnose the lateral meniscus. (*Id.*) Dr. Sola stressed the importance of physical therapy to regain full range of motion in the knee.

At the next visit on March 30, 2015, Dr. Sola noted that Plaintiff still lack "a good 10 degrees" extension in the left knee and again noted that a lateral meniscus tear was a

potential diagnosis. (Tr. at 370). At that time, Dr. Sola recommended a cortisone injection and more therapy to regain extension. (*Id.*).

When Plaintiff next saw Dr. Sola on April 13, 2015, the extension was still lacking at 10 degrees, "maybe even 15 [degrees] of full extension." (Tr. at 371). Dr. Sola's notes reflect that the cortisone injection only helped Plaintiff for 3 or 4 days. (*Id.*). At a visit a month later, Dr. Sora noted that Plaintiff was lacking "a good 15 [degrees] of full extension." (Tr. at 372). He noted that Plaintiff had "completely exhausted conservative care." (*Id.*). Still suspecting that a lateral meniscus tear was a possibility, Dr. Sola ordered an arthroscopic evaluation of the knee. (*Id.*).

A diagnostic arthroscopy was performed on June 5, 2015. (Tr. at 374). That procedure revealed a "tear of the anterolateral horn of the lateral meniscus, which was debrided with a full radius shaver to stable the rim." (*Id.*). Plaintiff followed up with Dr. Sola ten days later. (Tr. at 373). Dr. Sola again stressed the importance of therapy to regain full range of motion. (*Id.*). Plaintiff saw Dr. Sola again on July 8, 2015 (Tr. at 375), August 5, 2015 (Tr. at 376), and September 2, 2015 (Tr. at 377). At the September 2 visit, Dr. Sola noted that Plaintiff was again lacking 15 degree extension of the knee, which Dr. Sola could not explain. (Tr. at 377). On that date, Dr. Sola did another cortisone injection and indicated that he would see Plaintiff again on an as needed basis. (*Id.*). Plaintiff attended physical therapy sessions during his treatment with Dr. Sola. (Tr. at 627-652).

Plaintiff returned to Dr. Sola on September 28, 2015 (Tr. at 378). Plaintiff reported ongoing discomfort in the left knee and lacked at least 10 degree extension. (*Id.*) Dr. Sola's note indicates that he was "not sure there is much else we can do other than consider

viscosupplementation,"which he indicated he would try and set up. (*Id*.). An x-ray taken on that same day reflected three impressions:

(1) similar appearance to prior [2/27/2015] exam. Tricompartmental degenerative changes, probably greatest in the lateral knee compartment;

(2) calcification medial femoral epicondylar region suggesting possible old medial collateral ligament injury; and

(3) mild lateral patellar subluxation is stable."

(Tr. at 379).

In January 2016, Plaintiff had another arthroscopic surgery, this time a partial lateral meniscectomy, chrondoplasty, scar tissue excision, and manipulation. (Tr. 835-836). The January 2016 surgery was performed by Dr. Nathan Mall. (*Id*.). As he did following surgery in 2015, Plaintiff attended physical therapy sessions from February 2016 to May 2016. (Tr. at 1237-1280).

Dr. Mall continued to treat through September 2016. Dr. Mall ordered an EMG/nerve conduction study to evaluate femoral nerve function in order to determine why Plaintiff was having ongoing issues with leg strength. (Tr. at 405). That study was conducted by Dr. Daniel Phillips on May 3, 2016, and the results were normal (Tr. at 405, 426-431).

Dr. Mall released Plaintiff to return to work with restrictions per the Functional Capacity Evaluation on June 17, 2016 (Tr. at 402, 404), and found him to be at maximum medical improvement from his work injury on September 28, 2016 (Tr. at 402, 406).

On April 17, 2017, Plaintiff was evaluated by Julio Pardo, M.D., a medical

consultant retained by Defendant. (Tr. at 73-83). At that time, Plaintiff was 33 years old. Dr. Pardo reviewed a Consulting Exam ("CE") report from Dr. Adrian Feinerman dated March 22, 2017 (Tr. at 496-506), which diagnosed Plaintiff with obesity, degenerative joint disease, diabetes, hypertension, and asthma. It noted Dr. Feinerman's findings that Plaintiff "is able to sit, stand, walk, hear, speak, lift, carry, handle objections, and can handle funds on his own behalf. He has a limp and used a cane but was able to ambulate 50 feet without an assistive device. He has had repair of a torn meniscus in his left knee. He has a history of diabetes and hypertension without end organ damage. He complains of shortness of breath due to asthma." (Tr. at 77). Dr. Pardo found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk (with normal breaks) for a total of about 6 hours in an 8-hour day, and sit (with normal breaks) for about 6 hours in an 8-hour day. (Tr. at 79). He also found that Plaintiff could occasionally climb ramps/stairs, as well as ladders/ropes/scaffolds. (Tr. at 79). Dr. Pardo also found that Plaintiff could stoop on an unlimited basis, and occasionally kneel, crouch, and crawl. (Tr. at 80). Ultimately, based on the seven strength facts of the physical RFC, Dr. Pardo concluded that Plaintiff could perform light work, such as stuffer (sporting goods), mounter (photo-refinishing), and scoreboard operator (amusement and recreation). (Tr. at 82).

Another consultative examination by Dr. Richard Bilinsky in July 2017 found similar medically determinable impairments. (Tr. at 112-113). Dr. Bilinsky determined, however, that Plaintiff could stand/walk (with normal breaks) for a total of 2 hours (presumably in an 8-hour day) and, that based on the seven strength factors, would be

limited to sedentary work. (Tr. at 114-118).³

## DISCUSSION

**Interpretation of the MRI**

Plaintiff first contends the ALJ erred when she impermissibly interpreted the results of an MRI. Specifically, Plaintiff points to opinions from two medical consultants in April 2017 and July 2017 who found that Plaintiff could perform a reduced range of light work or sedentary work. (Tr. at 78-79; 112-118). Plaintiff also points to a functional capacity evaluation from July 2016 which limited Plaintiff to light-to-medium work due to a work-related knee injury. Plaintiff then notes that he underwent an MRI on January 3, 2018, in order to have his complaints of low back pain evaluated. The MRI resulted in three impressions:

> (1) diffusely dark bone marrow signal, could be something physiologic but some differential diagnosis considerations [];.
>
> (2) L5-S1 grade 1 retroliathesia, moderate right neural formaninal stenosis; and
>
> (3) Lesser spondylosis above.

(Tr. at 544).

Plaintiff claims that the ALJ impermissibly "interpreted" this MRI when she noted

---

³ Notably, the ALJ gave the opinions of Dr. Pardo and Dr. Bilinsky "little weight" because she found "the medical evidence and other evidence of record developed at the hearing level supports limiting [Plaintiff] to a sedentary exertional level," along with additional postural and environmental restrictions. (Tr. at 20). The ALJ likewise gave little weight to the opinions of non-treating physician Dr. Milne (who conducted numerous independent medical examinations during the pendency of Plaintiff's workers' compensation case in 2015 and 2016) and treating physician Dr. Mall (who evaluated Plaintiff on several occasions in 2016) because "the medical evidence and other evidence in the record developed at the hearing level support assigning a sedentary level of exertion with postural and environment limitations that differ from those assessed by Dr. Milne and Dr. Mall." (Tr. at 20).

that Plaintiff's treating Physician's Assistant, Chester Nay, interpreted the MRI to reveal "mild malignment at L5, which he suggested could cause [Plaintiff's] chronic pain." (Tr. at 18). Because the consultant's opinions mentioned above predate this MRI and a treating provider's objective finding consistent with Plaintiff's subjective symptoms, Plaintiff contends the case must be remanded.

Simply put, the Court disagrees. As Defendant points out, a review of the ALJ's decision demonstrates that she did not "interpret" anything with respect to the MRI. Instead, she considered and reasonably weighed the MRI results, as interpreted by P.A. Nay, along with all of the documentary and testimonial evidence in the record. She specifically noted that Plaintiff's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms; however, [Plaintiff's] statements concerning the *intensity, persistence and limiting effects* of [those] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 17 – emphasis added). After reviewing all the evidence in the record, she concluded that objective testing (diagnostic imaging studies—including the MRI at Exhibit 12F) were "generally mild or otherwise unremarkable." (Tr. at 21). She also noted that "[o]bservations by treating and examining sources . . . revealed minimal functional limitations, even considering [Plaintiff's] use of a non-prescribed cane," and "[t]reatment was conservative and [Plaintiff] often elected not to pursue modalities beyond medication." (*Id.*) She ultimately concluded that the established residual functional capacity adequately accommodated his ongoing symptoms by "restricting him to a sedentary exertional level with additional exertional, postural, and environmental limitations, and requiring he be able to use an

assistive device." (*Id.*) While the MRI obviously outdates the state consultants opinions, as mentioned above, the ALJ gave those opinions little weight. In any event, Plaintiff points to no medical evidence to establish that later evidence is significant enough that it would have changed the consultants' opinions. *See Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018).

As for a need for the ALJ to have called a medical expert to review the MRI evidence, to the extent Plaintiff is making this argument as a reason for remand, his argument is misplaced. While it is true that the ALJ may not "play doctor" and interpret "new and potentially decisive medical evidence without medical input," the ALJ here did no such thing. In *McHenry v. Berryhill*, 911 F.3d 866 (7th Cir. 2018), a case cited by Plaintiff, the ALJ compared test results with earlier treatment records to determine if the plaintiff's back impairment remained the same during the relevant period. *McHenry*, 911 F.3d at 871. This was an error at Step 3 of the sequential evaluation process, which Plaintiff has not contested here.

Similarly, in *Akin v. Berryhill*, 887 F.3d 314 (7th Cir. 2018), the other case cited by Plaintiff here, the ALJ impermissibly "played doctor" when he noted that MRI results were "consistent" with the plaintiff's impairments and then based his assessment of her residual function capacity on those MRI results. Again, here the ALJ summarized P.A. Nay's interpretation of the MRI results; she did not make an impermissible interpretation of them herself. This argument for remand fails.

**Step 2 Finding re: Severe Impairments**

At step 2, the ALJ must determine whether the claimant has one or more severe

impairments. This is only a "threshold issue," and, as long as the ALJ finds at least one severe impairment, she must continue on with the analysis. At step 4, she must consider the combined effect of all impairments, severe and non-severe. Thus, a failure to designate a particular impairment as "severe" at step 2 does not matter to the outcome of the case, as long as the ALJ finds that the claimant has at least one severe impairment. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (citing *Castile v. Astrue*, 617 F.3d 923, 927-928 (7th Cir. 2010)).

An impairment (or combination of impairments) is "severe" if it "significantly limit[s] an individual's ability to perform basic work activities and must last or be expected to last at a 'severe' level for a continuous period of twelve months or be expected to result in death." 20 C.F.R. 404.1520(c). Here, the ALJ found that Plaintiff has the following severe impairments: obesity, diabetes mellitus with peripheral neuropathy, and degenerative disc disease of the lumbar spine. (Tr. at 13).

An impairment is not severe when "medical and other evidence establish only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." 20 C.F.R. 404.1522, 416.922; After reviewing the medical records and a March 22, 2017 consultive examination by Dr. Adrian Feinerman, the ALJ found that Plaintiff's torn meniscus left knee status post-surgical repair and his bilateral hip and knee degenerative joint disease were non-severe. Because the records from Plaintiff's primary care provider, P.A. Chester Nay, reflected that Plaintiff's hypertension was under control, the ALJ also concluded that his hypertension was non-severe.

Similarly, the ALJ noted that there was no evidence in the record to support an impairment of peripheral venous insufficiency, and thus that impairment also was found to be non-severe. The ALJ reviewed aerobic capacity testing results, a chest x-ray in the records, as well as a variety of other medical records, to conduct that his asthma "does not appear to cause significant symptoms or cause more than mild function limitations," and thus she concluded that his asthma was likewise a non-severe impairment. And finally, because the record contained "no objective medical evidence to substantiate [Plaintiff's] allegations that nerve damage resulting from a right arm injury is a medically determinable impairment" (Tr. at 15), the ALJ concluded that Plaintiff did not have a right arm impairment.

After sorting through Plaintiff's impairments and determining which were "severe" and "non-severe," the ALJ went on to consider whether the non-severe impairments, when considered in combination, as well as Plaintiff's severe impairments, may affect his functional capacity and the effect that the non-severe impairments may "have on his ability to function when formulating the residual functional capacity." (Tr. at 15).

Although Plaintiff "acknowledges that the failure to designate a particular impairment as 'severe' at Step 2 can be harmless error," he goes on to argue that "to be harmless error, the ALJ must find at least one (1) severe impairment, continue with the analysis at subsequent steps and consider the combines effects of all severe and non-severe impairments," *citing Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). This argument is difficult for the Court to understand, because that is exactly what the ALJ

did here. She found three severe impairments and several non-severe impairments and then considered whether the non-severe impairments, when considered in combination, as well as with Plaintiff's severe impairments, may affect his functional capacity. The ALJ also considered the effect that the non-severe impairments had on his residual functional capacity, before considering all five steps of the sequential evaluation process discussed above.

Even though Plaintiff effectively concedes that the ALJ's error at Step 2, if there was any, was harmless, Plaintiff goes on to take issue with the ALJ's finding that his degenerative joint disease of the left knee and peripheral venous insufficiency were non-severe impairments. Plaintiff asserts that the ALJ "cherry-picked" some evidence while "ignoring the evidence as a whole." (Doc. 24, p. 8). An ALJ is of course not required to address every piece of evidence in the record. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). At the same time, of course, the ALJ cannot highlight only the evidence that supports her conclusion while ignoring contrary evidence that supports Plaintiff's application. *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014). Rather, she must consider all relevant evidence in the case record and evaluate the record fairly. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3). In this case, the ALJ did just that—she carefully reviewed and considered the medical evidence from Plaintiff's treating and examining sources as to all of Plaintiff's claimed impairments. Her ultimate finding was that Plaintiff could do sedentary work and would require the use of an assistive device. The Court finds that there is substantial evidence in the record to support this finding.

Plaintiff has not identified any error requiring remand. Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d 507, 510 (7th Cir. 2019); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## CONCLUSION

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **AFFIRMED**. This action is **DISMISSED with prejudice**, and the Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

DATED: September 20, 2021

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**